# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1046 | **DATE** | 5/25/2000 |
| **CASE TITLE** | Central States vs. Gary White, Inge White | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Plaintiffs' Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, the Plaintiffs' Motion for Summary Judgment is GRANTED [Doc. # 28-1]. The Plaintiffs shall file an additional brief as to the dollar amount of liability by June 9, 2000. The Defendants shall file a response by June 23, 2000. The deadline for filing the final pretrial order, the final pretrial conference, and the trial are all stricken. A status hearing is scheduled for June 29, 2000 at 9:30 a.m. Motion for leave to file jury demand instanter is denied as moot [Doc. # 20-1].

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | 2 number of notices | |
| | No notices required. | | |
| X | Notices mailed by judge's staff. | MAY 26 2000 date docketed | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | 42 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 5-25-00 date mailed notice | |
| MEA (lc) | courtroom deputy's initials | Parry mailing deputy initials | |
| | Date/time received in central Clerk's Office | | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and HOWARD McDOUGALL, Trustee, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. 99 C 1046<br>)<br>) HONORABLE DAVID H. COAR |
| GARY L. WHITE and INGE T. WHITE, | )<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

DOCKETED
MAY 26 2000

Before this court is plaintiffs Central States, Southeast and Southwest Areas Pension Fund, and Howard McDougall's, as trustee (collectively "The Pension Fund" or "the plaintiffs") motion for summary judgment for withdrawal liability from defendants Gary and Inge White (collectively, "the Whites" or "the defendants") under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1301-1461. For the following reasons, the plaintiffs' motion is GRANTED.

### Statement of Facts

Central States, Southeast and Southwest Areas Pension Fund is a multiemployer pension plan within the meaning of Sections 3(37) and 4001(a)(3) of ERISA, 29 U.S.C. §§ 1002(37) and 1301(a)(3). (Pl's Stmt. of Facts ¶ 1). The defendants, Gary L. White and Inge T. White, are husband and wife. Gary White owned 93.53% of the issued and outstanding voting shares of stock of Trans

1

42

Jones, Inc. ("Trans Jones"), a trucking supplier company that Gary White purchased in 1986.[1] (Pl's Stmt. of Facts ¶ 13; Dft's Addt'l Facts ¶ 21). Gary White served as CEO of Trans Jones until he resigned in January or February of 1994. (Dfts' Addt'l Facts ¶ 22; Pl's Ex. D, p. 12). Trans Jones owned 100% of the issued voting shares of stock of Jones Transfer Company ("Jones Transfer"). (Pl's Stmt. of Facts ¶ 12). Jones Transfer was subject to collective bargaining agreements executed between itself and various local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT"), pursuant to which Jones Transfer was required to make contributions to the Pension Fund on behalf of certain of its employees. (Pl's Stmt. of Facts ¶ 7).

In December of 1992, Trans Jones and Jones Transfer ceased business operations and filed Chapter 7 bankruptcy petitions in the United States Bankruptcy Court for the Eastern District of Michigan. (Pl's Stmt. of Facts ¶ 6). The Pension Fund determined that on or about December 27, 1992, Jones Transfer permanently ceased to have an obligation to contribute to the Pension Fund. (Pl's Stmt. of Facts ¶ 8). As of that date no member of the Trans Jones Controlled Group[2] was

---

[1] While Gary White admits in his deposition that he owned 93.53% of the shares of Trans Jones, and the Amended List of Equity Security Holders executed by Gary White and filed in the Trans Jones bankruptcy proceedings lists him as a 93.53% share holder, Gary White submitted an affidavit contradicting this testimony. (Pl's Stmt. of Facts ¶ 13; Dfts' Resp. Facts ¶ 13). However, a party cannot defeat summary judgment by submitting an affidavit that contradicts admission in a prior deposition or otherwise sworn testimony. Adusumilli v. City of Chicago, 164 F.3d 353, 360 (7th Cir. 1998); Diliberti v. United States, 817 F.2d 1259, 1263 (7th Cir. 1987).

[2] The plaintiffs do not define "Trans Jones Controlled Group." However, documents the plaintiffs refer to when discussing the "Trans Jones Controlled Group" relate to Trans Jones, Jones Transfer and various subsidiaries, collectively. See, e.g. Pls' Ex. A,9. Therefore, the court assumes that references to "Trans Jones Controlled Group" refer to these entities.

contributing or was obligated to contribute to the Pension Fund. (Pl's Stmt. of Facts ¶ 9). The Pension Fund determined that the Trans Jones Controlled Group effected a complete withdrawal from the Pension Fund on December 27, 1992, within the meaning of Section 4203 of ERISA, 29 U.S.C. § 1383. (Pl's Stmt. of Facts ¶ 10). As a result of this complete withdrawal, all members of the Trans Jones Controlled Group incurred joint and several withdrawal liability to the Pension Fund in the amount of $7,015,006.84, as determined under Section 4201(b) of ERISA, 29 U.S.C. § 1381(b). (Pl's Stmt. of Facts ¶ 11). The Pension Fund received distributions from the Trans Jones bankruptcy proceeding in the total amount of $385,644.16. Other than these distributions, no other member of the Trans Jones Controlled Group has made any payment on the withdrawal liability assessment, with the exception of $4,329.39 recovered through post-judgment execution in a separate litigation against subsidiary corporations of Trans Jones.[3] (Pl's Stmt. of Facts ¶ 46).

On the date of the complete withdrawal, December 27, 1992, Gary and Inge White also owned a house with two detached carriage house apartments at 51 West Boston Boulevard in Detroit, Michigan ("The Carriage House property"). (Pl's Stmt. of Facts ¶ 14). Gary White purchased the Carriage House property on May 22, 1969 for $30,000, just prior to his marriage to Inge White. (Pl's Stmt. of Facts ¶ 15). The Whites owned the Carriage House property until 1996, when they sold it for $400,000. (Pl's Stmt. of Facts ¶ 21). Inge White testified that her name was placed on the deed for the Carriage House property at the time that the mortgage on the property was refinanced, on or about January of 1973. (Pl's Stmt. of Facts ¶ 18). Mortgage payments on the

---

[3] Central States, Southeast & Southwest Areas Pension Fund v. City Transfer & Storage Co., No. 93 C 4811 (N.D.Ill.), involving Trans Jones subsidiaries City Transfer & Storage Co., Customer First, Inc., Mohican Express Limited, Express Hub Center, Inc., and Eldridge Truck Line, Inc. (Pl's Stmt. of Facts ¶ 46).

Carriage House property were made out of bank accounts jointly owned by the Whites. (Pl's Stmt. of Facts ¶ 19).

When Gary White purchased the Carriage House property in 1969, the previous owners had leased the two apartments to tenants. (Pl's Stmt. of Facts ¶ 20; Dfts' Addt'l Facts ¶ 8). The Whites continued leasing the two apartments to various tenants over the 27 years they owned the Carriage House property. (Pl's Stmt. of Facts ¶ 22). While there were times over those years where one or both of the apartments would be vacant, the Whites rented the apartments to approximately 20 to 30 tenants, usually college students, for lease periods ranging from one academic year to two to three years. (Pl's Stmt. of Facts ¶ 23; Dfts' Addt'l Facts ¶¶ 15, 17, 18). The Whites would determine the rent to be charged for their apartments by asking neighbors their rental rates. (Dfts' Addt'l Fact ¶ 43). The Whites never rented either of the apartments to anyone working for or connected with Trans Jones or Jones Transfer. (Dfts' Addt'l Facts ¶ 40).

Both Gary and Inge White were involved in the day-to-day operations of the apartments. Tenants of the two apartments would hand deliver their rent checks to Inge White, and either Gary or Inge White would deposit the rent into a joint bank account. (Pl's Stmt. of Facts ¶ 31). Expenses for the two apartments were paid out of bank accounts held jointly by the Whites. (Pl's Stmt. of Facts ¶ 30). Inge White would talk to prospective tenants about the apartments and details about rent and availability. (Pl's Stmt. of Facts ¶ 32). Both Inge and Gary White would contact maintenance workers for repairs and Inge White would give workers access to the apartments, discuss repairs, and pay the bills. (Pl's Stmt. of Facts ¶ 33).

Shortly after the purchase of the Carriage House property in 1969, Gary White had communications with the Internal Revenue Service on the allocation of expenses attributable to the

4

apartments. An agreement was reached that all common expenses, such as mortgage interest, homeowner's insurance, real estate taxes, landscaping, etc., would be attributed 5/8's to the main house and 3/8's to the apartments. (Pl's Stmt. of Facts ¶ 29). During each and every year the Whites owned the Carriage House property, they filed a Schedule E to their joint Federal Income Tax Returns upon which they reported income and losses associated with the rental of the apartments.[4] (Pl's Stmt. of Facts ¶¶24-28).

Gary and Inge White cannot recall if the apartments were actually rented on December 27, 1992, the date of the complete withdrawal. (Dfts' Addt'l Facts ¶¶27, 38). Any records demonstrating the actual periods of time the apartments were rented in 1992 are no longer available. (Dfts' Addt'l Facts ¶ 37). However, the Whites did report rental income and expenses for the apartments in both their 1992 and 1993 federal income tax returns. (Pls' Stmt. of Facts ¶¶26, 27).

On or about January 20, 1993, Trans Jones and Jones Transfer received a notice and a demand for payment of withdrawal liability issued by the Pension Fund in accordance with Sections 4202(2) and 4219(b)(1) of ERISA, 29 U.S.C. §§ 1382(2) and 1399(b). (Pls' Stmt. of Facts ¶ 38; Pls' Ex. A, 3). Two more demands and notices were sent on February 19th and March 8th of 1993. (Pls' Stmt. of Facts ¶¶ 39, 40). On or about August 11, 1993, Trans Jones, Jones Transfer, and various subsidiaries initiated arbitration of the Pension Fund's withdrawal liability assessment against them in accordance with Section 4221 of ERISA, 29 U.S.C. § 1401. (Pls' Stmt. of Facts ¶ 44). Trans Jones, Jones Transfer, and the various subsidiaries dismissed the arbitration proceedings in 1996.

---

[4] In 1990, the Whites reported rental income of $8,700 and expenses of $14,179; 1991, rental income of $5,600 and expenses of $34,101; 1992, rental income of $4,500 and expenses of $41,659; 1993, rental income of $7,200 and expenses of $20,274. (Pl's Stmt. of Facts ¶¶24-27).

5

(Pls' Stmt. of Facts ¶ 45). The Pension Fund filed this action to collect withdrawal liability from the Whites, which is now before this court on summary judgment.

## Standard for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter if law." Fed.R.Civ.P. 56(c); Cox v. Acme Health Serv., Inc., 55 F.3d 1304, 1308 (7th Cir. 1995). A genuine issue of material fact exists for trial when, after viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co, 47 F.3d 928, 931 (7th Cir. 1995). The party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg, 47 F.3d at 931. If this burden is met by the movant, the non-movant must then set forth specific facts to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324. While affidavits, depositions and interrogatories are acceptable evidence for the non-movant to present, these are not the exclusive forms of evidence that can be used in responding to summary judgment. Wright, Miller & Kane Federal Practice and Procedure: Civil 3d § 2721. In deciding a motion for summary judgment, the court must read the facts in a light most favorable to the non-movant. Cuddington v. Northern Ind. Public Serv. Co., 33 F.3d 813, 815 (7th Cir. 1994). However, Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A

scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion: "there must be evidence on which they jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

## Analysis

The Pension Fund argues that Trans Jones, Jones Transfer, various subsidiaries, and the unincorporated leasing business of the two apartments are all commonly controlled. The Whites, therefore, as partners in the unincorporated leasing business, are jointly and severally liable. (Pls' Motion, p. 2). The Whites respond that the unincorporated leasing business is not commonly controlled with Trans Jones and Jones Transfer, for they are not economically related. Even if they were commonly controlled, the rental activities do not rise to a level of trade or business. Third, Inge White is not jointly and severally liable, for she did not intend to form a partnership in the leasing business. Finally, the plaintiffs' claim is barred by laches. (Dfts' Resp., p. 2).

Under ERISA, as amended by the MPPAA, 29 U.S.C. §§ 1381-1461, an employer who ceases to contribute to a multiemployer pension fund governed by ERISA is liable for "withdrawal liability." Central States, Southeast & Southwest Areas Pension Fund v. Ditello, 974 F.2d 887, 888 (7th Cir. 1992). "Withdrawal liability" is the employer's proportionate share of "unfunded vested interests." Id., 29 U.S.C. § 1381. Withdrawal liability ensures that an employer retains responsibility for the financial burden of his employees' vested pension benefits, thereby preventing the employer from shifting the burden to other employers in the plan and ultimately to the pension fund itself, which insures such benefits. Ditello, 974 F.2d at 888.

At issue in the present case is the application of two Seventh Circuit cases that address withdrawal liability. The Pension Fund argues that Central States, Southeast & Southwest Pension

7

Fund v. Personnel, 974 F.2d 789 (7th Cir. 1992), should apply. In <u>Personnel</u>, the Seventh Circuit held that for businesses to be considered under "common control," the businesses do not have to be economically related. Instead, to establish withdrawal liability, the Pension Fund only has to prove that the defendants engaged in a trade or business. 974 F.2d at 793. In contrast, the Whites argue that the Seventh Circuit suggested in <u>Ditello</u>, decided two weeks after <u>Personnel</u>, that the purposes of the MPPAA were not furthered when withdrawal liability was imposed where there was no economic relationship between a withdrawing company and unrelated leasing activities. (Dfts' Resp., p. 4, citing <u>Ditello</u>, 974 f.2d at 890). The Seventh Circuit in <u>Ditello</u> stated, "this circuit has never squarely faced the issues of whether businesses must be economically related to be considered members of a controlled group of trades or business under section 1301(b)(1), and it remains an open question." 974 F.2d at 890.

While the Seventh Circuit still has not addressed the apparent discord between <u>Personnel</u> and <u>Ditello</u>, this court has in <u>Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Kelly</u>, 1996 WL 507258 (N.D.Ill.). In <u>Kelly</u>, this court chose to follow the reasoning of <u>Personnel</u>, for the plain language of section 1301(b)(1) does not impose the economic nexus requirement for trades or businesses. Section 1301(b)(1) of the MPPAA defines "single employer" as follows:

> . . . all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. . .
> 29 U.S.C. § 1301(b)(1).

The court applies the reasoning of <u>Personnel</u> to the present case, as well. It is the responsibility of the legislature and not the courts to establish the condition precedents to single employer liability

under section 1301(b)(1). Therefore, the fact that an economic relationship did not exist between the leasing of the Carriage House property apartments and Trans Jones, Jones Transfer, and the various subsidiaries, does not mean that the Whites cannot be held liable for withdrawal liability as a single employer under section 1301(b)(1). The evidence clearly shows that Gary White owned the Carriage House property as well as Trans Jones and Jones Transfer, and they were therefore under common control. (Pl's Stmt. of Facts ¶ 12, 13, 15, 18).

The next issue to address is whether the leasing of the Carriage House property apartments was a trade or business. In Personnel, the Seventh Circuit adopted the Supreme Court's definition of "trade or business" given in Comm'r of Internal Revenue v. Groetzinger:

> [T]o be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit.
> Personnel, 974 F.2d at 794, quoting Groetzinger, 480 U.S. 23, 35, 107 S.Ct. 980, 987 (1987).

Other factors in determining whether an activity was a trade or business include the defendant's intent in creating the enterprise and the defendant's tax treatment of the enterprise. Personnel, 974 F.2d at 794-95; Connors v. Incoal, Inc., 995 F.2d 245, 254 (D.C. Cir. 1993). The legal form of the enterprise is not dispositive of whether the enterprise is a trade or business. Connors, 995 F.2d at 254; 29 U.S.C. 1301(b)(1). A defendant's self-serving statement of intent is not probative of whether an enterprise amounts to a trade or business; rather, the defendant must point to objective evidence that she did not intend to create a business. Connors, 995 F.2d at 254.

The Whites have been renting the two apartments since the purchase of the property in 1969. While the Whites state there were vacancies from time to time, the fact that the apartments have been rented to 20 to 30 tenants with leases of at least a year shows continuity and regularity in the rental

of the apartments. The Whites discussed rental rates with their neighbors to determine the market price. Similar to the situation addressed in Personnel, though the Whites recorded a loss on their income taxes from the apartment rentals, the losses become deductions, reducing the Whites' overall tax liability. Personnel, 974 F.2d at 795. Granted, a defendant's tax treatment of an activity is not dispositive of its status as a trade or business. Id. However, the Whites' argument that they did not understand the effects of their rental activities on their liability under ERISA or MPPAA, is not a defense to liability. Connors, 995 F.2d at 254. Therefore, the plaintiff has shown that the Whites' rental of the Carriage House property apartments was a trade or business.

As to the Whites' argument that Inge White did not intend to form a partnership in the rental activities, the plaintiff has provided ample evidence to show that a partnership existed. Central States, Southeast & Southwest Areas Pension Fund v. Miller, 868 F.Supp. 995, 1005 (N.D.Ill. 1994). Inge White admitted that she was placed on the deed of the Carriage House property in 1973. Both of the Whites received rent from tenants, made rental decisions, and scheduled repairs. Rents were deposited and payments were made out of joint accounts. They filed joint income tax returns that reported income and losses on the rental of the apartments. The Whites admit that they discussed and made decisions together on whether to rent the apartments and to whom. (Dfts' Addt'l Facts ¶¶ 10-12). Also, for the purposes of MPPAA, Gary White's interests in Trans Jones, Jones Transfer, and the rental property are attributable to Inge White. 26 C.F.R. § 1.414(c)-4(b)(5)(i); Conference of Teamsters Pension Fund v. Lafrenz, 837 F.2d 892, 894 (9th Cir. 1988) ("[a]n interest in an organization is attributed to the owner's spouse to prevent the use of marital property to circumvent federal law."). See also, Central States, Southeast & Southwest Areas Pension Fund v. Johnson, 991 F.2d 387, 393 (7th Cir. 1993); Ditello, 974 F.2d at 891, n. 1. Therefore, Inge White is jointly

10

and severally liable for the debts of the partnership, including the withdrawal liability debt.

Finally, the court must address the Whites' laches argument. The prevailing rule is that if a plaintiff brings a federal statutory claim seeking legal relief and the statute has an express limitations period within which the action must be taken, laches cannot bar that claim. United States v. Mack, 295 U.S. 480, 489, 55 S.Ct. 813, 818 (1935); Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 260 (2nd Cir. 1997); Ashley v. Boyle's Famous Corned Beef Co., 66 F.3d 164, 169-70 (8th Cir. 1995); Combs v. Western Coal Corp., 611 F.Supp. 917, 920 (D.D.C. 1985). The MPPAA contains an explicit statute of limitations, and the Whites admit that the action is brought within that period. 29 U.S.C. ¶ 1451(f); Dfts' Resp., p. 13. Therefore, laches is unavailable.

The Pension Fund states that the defendants are joint and severally liable for $7,015,006.84. (Pl's Stmt. of Fact ¶ 11). The Pension Fund states that it received $385,644.16 in distributions from the Trans Jones bankruptcy proceeding, as well as $4,329.39 through post-judgment execution in a separate litigation against various subsidiaries of Trans Jones and Jones Transfer.[5] (Pl's Stmt. of Facts ¶ 46). The Whites do not respond to these amounts and it is unclear for what amount they are now liable. Therefore, as to the dollar amount of the withdrawal liability of the Whites, the Pension Fund is directed to file an additional brief stating the amount sought, and the Whites will have an opportunity to respond. The parties are urged to meet and confer in order to reach agreement on the amount due.

---

[5] Central States, Southeast & Southwest Areas Pension Fund v. City Transfer & Storage Co., Case No. 93 C 4811.

11

## Conclusion

For the foregoing reasons, plaintiffs Central States, Southeast and Southwest Areas Pension Fund, and Howard McDougall's, as trustee, motion for summary judgment for withdrawal liability from defendants Gary and Inge White under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1301-1461, is GRANTED. The Pension Fund shall file an additional brief as to the dollar amount of liability 14 days from the date of this judgment. The defendants shall file a response 14 days thereafter.

Enter:

David H. Coar
United States District Judge

Dated: May 25, 2000